No. 16,611.

BRIGHTON DITCH COMPANY ET AL. *v.*
CITY OF ENGLEWOOD.
(237 P. [2d] 116)

Decided October 8, 1951.

Mr. William W. Gaunt, Mr. Pierpont Fuller, Jr., Mr. J. Glenn Donaldson, Mr. Glen G. Saunders, Mr. Wayne D. Williams, for plaintiffs in error.

Mr. M. O. Shivers, Jr., Mr. William R. Kelly, for defendant in error.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

THE City of Englewood, through purchase of certain ranch property and 82.5 shares of the capital stock of the Nevada Ditch Holding Company, acquired title to 19.76 second feet of water of the South Platte river, originally decreed to the Nevada ditch, and one foot of water decreed to the Platte Canon ditch, and in this proceeding seeks change of point of diversion of said water to the headgate of the Petersburg ditch some sixteen miles further down the South Platte river with change of use of the water from irrigation to domestic and municipal purposes. Of this Nevada water, 8.88 feet was of August 30, 1861 priority, and 10.88 feet of December 30, 1865, priority, and the one foot of Platte Canon water was of December 30, 1863 priority. Forty-five of said shares of Nevada capital stock and water were formerly owned by the Great Western Sugar Company which, in 1920, obtained decree for change of point of diversion of that water, to wit, 4.84 feet of said earlier Nevada decree and 5.93 feet of its later decree, to the headgate of the Platte Canon ditch, where it has since been diverted and used in the irrigation of 600 acres of farm land located above the Nevada ditch. Thereafter the City of Denver acquired titled to the three Platte Canon ditch appropriations, totalling 56 second feet, and on February 25, 1926, had decree for change of the point of diversion of said water to its headgates further down the stream, upon condition that it transfer to the Great Western Sugar Company one foot of water, and transfer to the Last Chance Ditch Company No. 2, 8.5 feet of water, both of December 30, 1863, priority. The latter company had owned the Last Chance ditch, located between the Platte Canon ditch and the Nevada ditch, to which had been awarded 32 feet of water of March 3, 1868, priority, but in 1921 had procured decree for change of point of diversion of said water to the Platte Canon ditch and had abandoned its separate ditch. Said 8.5 second feet of water was awarded to the Last Chance Company and one foot to the Great Western Sugar Company to compensate

for additional loss to those companies due to the removal of the Platte Canon ditch appropriations from the Platte Canon ditch and its diversion elsewhere by the City of Denver, and the one foot of the Platte Canon water included in this proceeding is the one foot so acquired by the Great Western Sugar Company. Accordingly, 11.77 feet of the water sought to be changed in this proceeding would now come from the Platte Canon ditch and the remaining 8.99 feet from the Nevada ditch.

The trial court found in substance, that the vested rights of the Nevada Ditch Holding Company and its remaining stockholders would not be injuriously affected by the transfer here sought, provided that petitioner should leave in the Nevada ditch water represented by 4.5 shares of its capital stock, being 1.078 feet of water, and continue to pay all assessments on petitioner's full 82.5 shares of said capital stock. That finding is not protested by the Nevada Company, or by petitioner.

The trial court also found that the vested rights of the Last Chance Ditch Company No. 2 and its shareholders would not be injuriously affected by the change here sought, provided petitioner should leave for diversion in the Platte Canon ditch one foot of water of December 30, 1865, priority, and continue payment of assessments thereon, and should further improve the portion of the ditch crossing the Sugar Company ranch so as to minimize the loss of water carried therethrough, and further pay 12½ per cent of the maintenance expense on the ditch from its headgate to the north line of said ranch. These conditions were agreed upon by stipulation with the Last Chance Ditch Company No. 2, and that company does not appear as a protestant, but certain stockholders of said company made protest, claiming injury by reason of the proposed change.

The trial court found that the change here sought would not injuriously affect the vested rights of the City and County of Denver, provided that, "whenever water is not being diverted by other appropriators on the South

Platte River in Water District No. 8 for direct irrigational purposes, the petitioner will not call for, or demand that, said transferred water shall flow past the headgate of Junior Decreed Appropriations now belonging to the City and County of Denver at such times as the needs of said Junior Decreed Appropriations are unsatisfied; provided further that when by reason of petitioner's diversion of said transferred water at the headgate of the Petersburg Ditch, the amount of water available for diversion at the headgate of the City Ditch upon Priority 75, dated November 1, 1873, is as a result less than the full decreed amount of thirteen cubic feet of water per second of time the petitioner will, in that event, call past said headgate of the City Ditch only 16.182 cubic feet of said transferred water per second of time, leaving available at said City Ditch headgate, 2.5 cubic feet of said water for diversion by the said City Ditch, said 2.5 cubic feet of water per second of time representing the return flow from acreage no longer to be irrigated by direct flow under the Platte Canon Ditch."

The trial court found, in substance, that the change here sought would not injuriously affect the vested rights of the Platte Valley Ditch Company and its shareholders, provided that at such times as the water in the river is so low that the full six-foot appropriation of said ditch is not available, petitioner, upon call, should replace in the river not to exceed 4.5 feet of water, being the estimated return flow from the irrigation of the Sugar Company ranch, which, it was decreed, should not further be irrigated from the river.

The trial court further found, in substance, that the change here sought would not injuriously affect any other water users, provided that petitioner should relinquish to the river four cubic feet of water, of December 30, 1865, priority, and make no demand for water in excess of 14.682 feet at its Petersburg ditch headgate, and further should not divert its water rights so or when as to affect prejudicially the rights of appropriators of

water for storage purposes on the river below. There was substantial evidence to support each of these findings in the testimony of competent engineers based on study of the official records of the river.

None of the appropriators for storage purposes below petitioner's point of diversion here appears as protestant, but only said Last Chance minority shareholders, the City of Denver, and certain ditch companies holding direct water rights from the river below the point of return flow of water from the Denver sewer system, through which return waters of Englewood, as well as Denver, are returned to the river.

Although each of these groups of protestants occupies a different situation from that of the others, they join in the opening brief wherein they attempt to set out the damaging effect of the decree as to each group separately, but make no separate discussion or development of their different situations in the argument.

■ It is contended in behalf of all protestants that the decree authorizes the use of abandoned water and it is categorically stated that "there is clear, uncontroverted and convincing evidence in this case that all of said water had been abandoned prior to 1920." However, the evidence referred to as supporting such contention has no probative value to establish it, and there is ample evidence in the record to the contrary. The contention is without merit.

■ It is contended repeatedly by all protestants, that the decree will permit double use of the water, for the reason that the provision in the decree will not be obeyed which requires that the farm lands upon which the water heretofore has been used be dried up. As we said in *Del Norte Irrigation Dist. v. Santa Maria Res. Co.,* 108 Colo. 1, 113 P. (2d) 676, injury "must be demonstrated by evidential facts and not by potentialities." If the fact that decrees might be disobeyed were ground for reversal, few of them could stand.

■ It further is urged by all protestants that peti-

tioner has not sustained the burden of proof. The sufficiency of the evidence to meet such burden is properly to be determined by the trial court and where there is substantial evidence to support its findings, they will not be disturbed. *Hallet v. Carpenter,* 37 Colo. 30, 86 Pac. 317; *Wadsworth Ditch Co. v. Brown,* 39 Colo. 57, 88 Pac. 1060.

██ Protestants' brief contains numerous contentions that conditions permitted by the decree are injurious to other appropriators without showing of any injury to the particular protestants here before the court. Such general contentions are not grounds for reversal. No protestant may properly object to change of point of diversion on grounds that others than himself would be harmed thereby. *Crippen v. Glasgow,* 38 Colo. 104, 87 Pac. 1073.

As to the first group of protestants, who are minor shareholders in the Last Chance Ditch Company No. 2, it appears that their claim of injury is based upon three grounds: A. That the decree fails to safeguard said protestants from the injurious effects of substantial diminution of flow of water in the ditch. B. That the change of diversion deprives them of the benefits of rotation of use of water in the ditch. C. That the decree does not protect Last Chance users against damage by increased seepage and evaporation losses.

We shall assume, without determining, the right of these minority stockholders to protest after their ditch company had accepted the conditions and restrictions offered by petitioner and stipulated and consented to the change of point of diversion, subject thereto.

██ As to ground A: It is elementary learning in Colorado that a water priority is a property right—not a mere revocable privilege; that it is not a fixed appurtenance; that the right to change its place of use and the point of diversion is an inherent property right, not conferred by our remedial statute, but pre-existing as an incident of ownership, and always enforceable so long as

the vested rights of others are not injuriously affected. *Wadsworth Ditch Co. v. Brown, supra; Lower Latham Ditch Co. v. Bijou Irr. Co.,* 41 Colo. 212, 93 Pac. 483. The limitation upon such change is not the mere inconvenience in use or even loss to others resulting thereby, but injury affecting "the vested rights of others in and to the use of water." Such vested rights include not only right to diversion of water from the stream in the chronological order of priority, but also the right to maintenance of conditions on the stream existing at the time of appropriation. However, when an appropriator has actually diverted water from the stream under his priority, the water he has taken is no longer a right, but a possession; it is not an interest in real estate, but personal property. The term "vested rights" in our statute pertaining to change of point of diversion applies to water rights, not to water in possession. The loss of water by seepage or evaporation, after diversion from the stream to a ditch, is not an injury to, or loss of, a water right as between the ditch cotenants. Each of several water appropriators using a ditch in common may separately abandon his right thereto, and injury to one by virtue of the other's abandonment of all or part of the ditch by change of point of diversion or of place of use is not an actionable injury. *Compton v. Knuth,* 117 Colo. 523, 190 P. (2d) 117.

The case of *In Re Johnson,* 50 Idaho 573, 300 Pac. 492, involved application for change of point of diversion to permit use of water on other lands. Protest was made upon the ground that the transfer would increase the percentage of carrying losses in the canal and deprive the protestant company of revenues in assisting in the upkeep of the canal and deprive its stockholders of the use, waste and runoff of the water when not otherwise used by the applicants for transfer. The court said: "The term 'injured' as used in the sections of the statute * * * applies to injury to the water right of another. It has no application to any damage or injury that may accrue to

another growing out of the fact that he is a tenant in common of the same conduit with the owner of the water transferred. In other words, the proximate cause of the injury to appellant is not the change of point of diversion, or the place of use, but the failure of respondents to longer use the Soda Canal in common with appellant."

Petitioner and protestants here are not shareholders in a mutual ditch company, as were those in *Wadsworth Ditch Co. v. Brown, supra,* and our attention is not called to any evidence of mutual obligations concerning the use of petitioner's Nevada water and protestant's Last Chance water, except such as necessarily exist by virtue of the fact that by prior changes of points of diversion they have become cotenants in use of the Platte Canon ditch. No contractual limitation appears as to the right of either to abandon its water right or its present ditch right, as each heretofore has abandoned a prior ditch right. These protestants then have no valid claim here by virtue of increased loss from evaporation or seepage due to petitioner's abandonment of the ditch. As to the conditions attached by the trial court for their benefit, we can only say, as was said in *Wadsworth Ditch Co. v. Brown, supra,* "Whether petitioner could complain of these conditions is not mooted. He accepts them."

As to ground B: There is no vested right by one ditch cotenant to rotation in use of water with another, in the absence of contract therefor, and no evidence either of contract or even long-continued custom here appears.

As to ground C: In its statement it is simply a repetition of A, since the increased seepage and evaporation losses would result only from the diminution of flow of water in the ditch complained of therein. However, under that heading, it further is urged that the decree is indefinite and incapable of enforcement in its provision that petitioner shall "improve that portion of the Platte Canon Ditch which crosses the Platte Canon Ranch * * * so as to minimize loss of water carried

through said portion of said ditch." To an extent this contention is true. However, for reasons already stated, this provision of the decree does not concern any vested right of these protestants and is not one to which they are legally entitled. If we should now remand the case, with instruction to the trial court to make a proper, definite and enforceable provision for ditch improvement in the decree, it could only eliminate the provision altogether, since none is proper. Therefore these protestants are not prejudiced by the provision of which complaint is here made.

As to the protest of the City and County of Denver: The damaging effects of the decree on Denver are given as: "A. The decree jeopardizes 500-acre feet of Denver storage water. B. Denver's city ditch water right is invaded by application of the decree. C. A new year-round water right senior to many of Denver's rights is created by the decree."

Concerning A: The 500-acre feet to which reference is made involves water which, by findings of the district court in 1933, it was necessary for Denver to deliver to the Platte Canon canal during each irrigation season upon call in order to avoid injurious effect to the vested rights of the Last Chance Ditch Co. No. 2, by virtue of removal of Denver's water from the ditch, the contention here being that heretofore in actual practice the Last Chance ditch has only required an average of 169 acre feet per year of said storage water, and that the call on this water will be increased under the new conditions created by the decree in the instant case. This conclusion is based on the testimony of City Water Rights' engineer, that if earlier rights in the ditch are removed, there will not be as much water in the ditch, so that seepage and evaporation loss will be greater, and they will have to call more often for the storage water. Assuming that this contention involves a vested right, it is without support, as there was competent evidence that the one

second foot required to be left in the ditch by petitioners will fully compensate for any such loss.

Concerning B: It is contended that if the Sugar Company ranch is dried up, Denver's city ditch will lose the return flow during the dry months of the summer which now flows in the river above the city ditch headgate. Counsel fail to mention the fact that the decree requires that there be left in the river "available at said City Ditch headgate, 2.5 cubic feet of said water for diversion by the said City Ditch, said 2.5 cubic feet of water per second of time representing the return flow from acreage no longer to be irrigated by direct flow under the Platte Canon Ditch," and they do not challenge the sufficiency of the amount so allowed. Denver counsel point to the testimony of a witness to the effect that there were times when there was not enough water in the river to supply its first decree, and contend that at such times drying up of the Sugar Company ranch would cause loss of the delayed return water from the ranch which otherwise would augment the flow in the river so as to help in filling her first priority. This is answered by the testimony of Engineer Tipton, that from measurements over many years on the river at Waterton it is inconceivable there should not be sufficient water at any time to fill Denver's first priority.

Concerning C: It is contended that the provision of the decree requiring that four second feet of water, of 1865 priority, flow past the Petersburg headgate continuously constitutes a senior prior demand on Denver's junior priorities that has not heretofore existed. On its face such contention is not maintainable; moreover, in the Denver reply brief, it is said: "It is not Denver's junior City Ditch rights which are injured by the decree. It is the early priority which is deprived of one-half the return flow from the Platte Canon Ranch * * *." As we have seen, the loss of such return flow has been compensated for in the decree, and the diversion of petitioner's

water below the Denver headgates, instead of above them, would appear to be to Denver's advantage.

As to effect of the decree on the third group of protestants, being certain ditches north of Denver, it is asserted that:  A. Western Slope return flow will be lost. B. Complete use under the decree will greatly increase the burden of consumptive loss to the Platte river.

■■■ The argument implicit in A is that Englewood now derives its supply of water from Denver; that because of that requirement Denver requires and diverts water from the Western Slope, the waste and return flow of which go to the benefit of appropriators down the stream; that if Englewood obtains its supply of water from a source other than Denver, the latter city will require less water from Western Slope diversion, and appropriators down the stream will suffer loss of the waste and return flow of such water heretofore enjoyed.  The contention that Englewood must continue to obtain its water from Denver in order to protect users below from loss of the return water therefrom would appear to be inconsistent with our recent ruling in the case of *City of Englewood v. City and County of Denver*, 123 Colo. 290, 229 P. (2d) 667, where we supported the contention of Denver that it was not obligated to continue supplying water to Englewood. Moreover, appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed.  *Stevens v. Oakdale Irr. Dist.*, 13 Cal. (2d) 343, 90 P. (2d) 58.

As to B, no injury to these protestants is shown and the evidence does not support their contention but, on the contrary, overwhelmingly justifies the finding of the trial court that none of the protestants' vested rights will be injured by the change of point of diversion here sought.

■■■ Finally it is urged by Denver's counsel that the trial court has ordered the taking of property without just compensation or due process of law, in that there is

included, as already noted, in the water sought to be diverted, one second foot which formerly belonged to the City of Denver. Heretofore, upon the petition of Denver for change of point of diversion of water, such change was granted upon condition that said second-foot be transferred to the ownership of the Great Western Sugar Company, to compensate for loss to that company from change of point of diversion. It is true that had Denver protested against such requirement in the decree, it might well have escaped its imposition, but no protest was made and the decree was accepted and became final; thereby the water became the property of the Great Western Sugar Company and by transfer from that company is now the property of petitioner.

The decree of the trial court is affirmed.